IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 26, 2010 Session

**SHAUN ALEXANDER HODGE v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Knox County**
**No. 80222     Mary Beth Leibowitz, Judge**

_____

**No. E2009-02508-CCA-R3-PC - Filed August 26, 2011**

_____

The petitioner, Shaun Alexander Hodge,[1] was convicted of first degree murder in 2001 and sentenced to life in prison. Thereafter, the petitioner filed a petition seeking post-conviction relief, which was denied by the post-conviction court. The petitioner appeals, claiming constitutional violations arising from the ineffective assistance of his trial counsel and the State's failure to disclose certain exculpatory evidence. The petitioner also seeks relief based on newly discovered evidence. After careful review of the record and the arguments of both parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Stephen Ross Johnson and Anne E. Passino, Knoxville, Tennessee, for the appellant, Shaun Alexander Hodge.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney, for the appellee, State of Tennessee.

**OPINION**

The facts of this case were recounted by this court at length during the review of the petitioner's direct appeal, *State v. Shawn Hodge*, No. E2002-01794-CCA-R3-CD, 2003

_____

[1] We note that in portions of the record and in the case caption on direct appeal, the petitioner's name was spelled "Shawn." However, we will use the spelling given on the petitioner's petition for post-conviction relief.

Tenn. Crim. App. LEXIS 1014, at **1-24 (Tenn. Crim. App. Dec. 8, 2003), *perm. app. denied* (Tenn. May 10, 2004).  To briefly summarize in pertinent part, in February 2001, the petitioner was convicted after trial by jury of the first degree premeditated murder of Mr. Benny Boling.  He was sentenced to life in prison with the possibility of parole.

At the petitioner's trial, the forensic evidence established that the victim was slain at a local housing project on April 26, 1998.  The victim died after being shot five times by a nine-millimeter semiautomatic handgun.  While the victim was initially shot from the rear as he occupied the cab of his pickup truck, he managed to drive himself a short distance away before running off of the road and ultimately fled on foot approximately seventy-five feet up a hill before collapsing near a day care center.  There, the victim's body was discovered, with the victim still clutching a $100 bill in his hand.  Police recovered a total of seventeen spent shell cartridges from the scene. During the autopsy, the victim's blood tested positive for cocaine.

The murder weapon was never recovered, and none of the forensic evidence definitively connected the petitioner to the victim's shooting.  The prosecution's case hinged on the testimony of four eyewitnesses.  Debra Turner, who lived in the community, testified that on the day of the shooting, she was at home when she heard someone outside threatening to kill someone if he did not buy drugs.  She looked out her back door and saw the petitioner talking to the victim, who was in his truck.  After she heard the victim refuse to buy the drugs, she heard a gunshot and saw the victim's truck moving away.  The petitioner followed the truck, firing into it.  When the truck struck a tree, the victim exited the truck and ran.  The petitioner followed him, still firing at the victim.  When the victim collapsed, the petitioner stood over him and shot him.  Patricia Hamilton, who was visiting Debra Turner at the time of the shooting, testified to essentially the same version of events.

A third witness, Lorraine Young, who lived nearby, testified that she knew the petitioner prior to the shooting.  The day prior to the shooting, she saw the victim drive into the housing projects and purchase drugs.  On the day of the shooting, Ms. Young was lying in bed when she heard a commotion and looked out her bedroom window.  She saw the petitioner and three men standing near the victim's truck having an argument about drugs and money.  She heard the victim refuse to buy drugs.  She left the window for a moment and then returned to see the victim crash his truck and flee away on foot while the petitioner shot him.

The final eyewitness, Tim Bolden, testified that he had previously sold the victim crack cocaine and did so on several occasions the day of the shooting.  At the time of the shooting, Mr. Bolden was gambling with some other men when he saw the victim drive up, looking to purchase additional drugs.  However, Mr. Bolden testified that he continued to

gamble and that the petitioner approached the victim's truck. Mr. Bolden testified that he heard loud voices, saw the victim leaving in his truck, and saw the petitioner firing at the victim. After the victim's truck struck a curb, the victim left the truck and fled on foot. The petitioner continued to shoot the victim and, afterward, came back down the hill while the men who were gambling fled the scene.

The defense's theory of the case was that the prosecution's four eyewitness identifications were erroneous and that one of those eyewitnesses, Mr. Tim Bolden, may have been the actual killer. The defense presented the testimony of six eyewitnesses in support of this theory. Latroy Askew, a friend of the petitioner, testified that the two rode around all night on Saturday night and that the petitioner went home before the shootings occurred on Sunday. Ms. Glenda Ward, who lived in a complex near the crime scene, testified that she looked out her window one day and saw one man chasing another man up a hill before shooting him. She testified that the shooter was not the petitioner. Reginald Woodruff, a childhood friend of the petitioner, testified that the petitioner came to his house the morning of the shooting and stayed with him, his son, and another man while they were playing video games. Pierre Jarrett, who was playing basketball nearby at the time of the shooting, testified that he heard shots, saw a truck move up a hill before coming to a stop, and saw a man who was not the petitioner standing nearby with a gun. Paul Chandler, a retired army officer who was collecting cans in the area when the shooting occurred, testified that he saw the murder and that the petitioner was not the shooter. Malik Hardin, the petitioner's cousin, testified that he was with the petitioner at the time of the shooting and that Mr. Tim Bolden had, in fact, shot the victim while the petitioner was gambling with others nearby. In addition to these eyewitnesses, the defense presented the testimony of two witnesses who testified that Debra Turner had made statements to them to the effect that she intended to falsely implicate the petitioner in the victim's murder in order to retaliate against the petitioner for beating and hospitalizing her son.

Midway through the defense's case, the petitioner's trial counsel examined the unusual possibility of personally taking the stand to testify concerning certain inconsistencies between Mr. Bolden's courtroom testimony during the State's case and some prior statements that Mr. Bolden had allegedly made to him at an unrecorded prison meeting. According to the petitioner's trial counsel, at a face-to-face meeting with him and with no one else present, Mr. Bolden made a statement concerning how the victim's truck had entered the housing projects on the day in question that was inconsistent with the testimony that he had given at trial on the same subject. In addition, Mr. Bolden allegedly claimed at that meeting that the petitioner had not shot the victim and that he had not seen who had done so. The petitioner's trial counsel had availed himself of the opportunity to cross-examine Mr. Bolden concerning these statements while the witness was still on the stand, but Mr. Bolden had claimed under oath that he could not recall making any of them. After considering the matter, the trial court

gave the petitioner's counsel permission to testify regarding his meeting with Mr. Bolden. However, after consulting with the petitioner, trial counsel decided not to take the stand, explaining that Mr. Bolden had not been a credible witness and that opening himself up to cross-examination would not be in the petitioner's best interests.

Following this testimony and the testimony of additional witnesses, the petitioner was advised of and waived his right to testify in his own defense pursuant to the procedure described in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999). The jury deliberated, and the petitioner was found guilty. On May 2, 2001, the petitioner was sentenced to life in prison with the possibility of parole. His conviction was affirmed on appeal by this court in 2003, against a sufficiency of the evidence challenge and certain claims of error with respect to witness intimidation, the jury instructions, and the admission of the testimony of Lorraine Young, an alleged mental patient. *See Hodge*, 2003 Tenn. Crim. App. LEXIS 1014, at **25-39.

On August 11, 2004, the petitioner filed a *pro se* petition for post-conviction relief. Thereafter, counsel was appointed to represent the petitioner. Post-conviction counsel moved the court for, and received, a subpoena to the Lakeshore Mental Health Institute for all medical records pertaining to prosecution eyewitness Lorraine Young. In response to the subpoena, post-conviction counsel received three full volumes of materials pertaining to Ms. Young's mental treatment at that facility. An amended petition was filed, in which the petitioner claimed, *inter alia*, that the petitioner's trial counsel had been constitutionally ineffective for failing to obtain these files, that the petitioner's due process rights had been violated by the State's failure to provide this allegedly exculpatory evidence, and that these records constituted newly discovered evidence of the petitioner's innocence.

Hearings were held on June 24, 2009, and August 6, 2009, after which the post-conviction court denied the petition. This appeal promptly followed.

ANALYSIS

In order to prevail on a claim for post-conviction relief, the petitioner must prove by clear and convincing evidence that his conviction is void or voidable by virtue of a constitutional violation. *Jason Calvert v. State*, No. M2008-00426-SC-R11-PC, 2011 Tenn. LEXIS 439, at **20-21 (Tenn. Apr. 28, 2011); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009); T.C.A. § 40-30-110(f). Upon appellate review, this court will not reweigh or reevaluate the evidence given below nor will it reassess issues such as the credibility of witnesses, the weight to be given their testimony, or the resolution of any conflicts in the evidence. *Momon*, 18 S.W.3d at 156. Rather, the post-conviction court's factual findings are conclusive on appeal unless the evidence preponderates against those findings. *Calvert*,

2011 Tenn. LEXIS 439, at **20-21. With these standards in mind, we review the petitioner's claims concerning the ineffective assistance of his trial counsel, the prosecution's failure to disclose exculpatory evidence, and newly discovered evidence, each in turn.

I.

The petitioner claims ineffective assistance of counsel on three grounds. First, the petitioner claims that his trial counsel's assistance was ineffective because he failed to effectively investigate the mental health history of prosecution witness Lorraine Young. Second, the petitioner claims his trial counsel was ineffective for interviewing prosecution witness Tim Bolden without bringing an additional witness or making an audio recording of the interview. Third, the petitioner claims that his trial counsel was ineffective for not withdrawing when a conflict arose between himself and the petitioner due to complaints the petitioner made against his trial counsel in the trial court and before the Board of Professional Responsibility. After carefully reviewing the record, relevant precedent, and the arguments of the parties, we reject each of these claims.

Both the Sixth Amendment of the U.S. Constitution and article I, section 9 of the Tennessee Constitution guarantee defendants in criminal trials the right to be represented by counsel. *See* U.S. CONST. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."); TENN. CONST. art. I, § 9 ("[I]n all criminal prosecutions, the accused hath the right to be heard by himself and his counsel."). "To succeed on a claim that [this] legal representation has been constitutionally inadequate, a criminal defendant 'must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense.'" *Calvert*, 2011 Tenn. LEXIS 439, at *21-*22 (*quoting Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)).

To meet the "deficient performance" prong of this two-part test, the petitioner must establish that "'counsel's representation fell below an objective standard of reasonableness' and overcame the 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Calvert*, 2011 Tenn. LEXIS 439, at *22 (*quoting Strickland v. Washington*, 466 U.S. 668, 688-89 (1984)). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 694. The petitioner may not challenge the decisions of trial counsel using the benefit of hindsight, may not second-guess a reasonably-based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See Strickland,* 466 U.S. at 694-95; *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).

In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999) (*quoting Strickland*, 466 U.S. at 694). "A defendant's failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." *Calvert*, 2011 Tenn. LEXIS 439, at *22 (internal quotation omitted).

## A.

The petitioner's first claim is that his trial counsel was ineffective for failing to obtain and use the mental health records of Ms. Lorraine Young. Prior to trial, the petitioner's trial counsel requested that the State turn over any mental health records relating to any of the State's witnesses, including Ms. Young. The prosecutor responded by advising trial counsel that she was not aware of Ms. Young ever receiving treatment for mental health issues. The petitioner's counsel also attempted to contact Ms. Young by telephone and interview her prior to trial. However, she refused to speak with him.

The petitioner argues that these attempts to obtain Ms. Young's mental health records were constitutionally insufficient. The petitioner argues that trial counsel should have conducted an inquiry into Ms. Young's mental health history similar to the one done by post-conviction counsel. However, we disagree. There appears to be no reason in the record for trial counsel to have suspected that Ms. Young suffered from mental health problems. Although the petitioner had known Ms. Young for a period of many years, it does not appear from the record that the petitioner raised the issue of Ms. Young's mental health issues with his trial counsel. Without something in the record to indicate that his trial counsel was placed on notice that Ms. Young suffered from any significant mental health problems, we do not believe that trial counsel fell below an objective standard of reasonableness in failing to investigate this issue further. Trial counsel's performance here has not been shown to be deficient.

## B.

The petitioner next claims that his trial counsel was ineffective for interviewing Tim Bolden without bringing a third party witness or making an audio recording of the interview. Because he failed to bring a witness or recording device to the interview, the petitioner claims that trial counsel was unable to effectively cross-examine Mr. Bolden at trial with inconsistent statements that he made during his interview.

However, the record does not establish that the petitioner's former trial counsel was

deficient in his performance with respect to this interview. According to the testimony of the petitioner's trial counsel at the post-conviction hearing, counsel intentionally chose to entice Mr. Bolden to speak to him by offering to come alone and not to tape the interview. Although interviewing under those circumstances would likely render it difficult to impeach Mr. Bolden in the future with any inconsistent statements, speaking to the witness in this unrecorded fashion could have potentially been very helpful to trial counsel in developing the petitioner's case and trial strategy. Moreover, according to his testimony, trial counsel hoped to bring witnesses and/or tape Mr. Bolden at subsequent interviews after gaining Mr. Bolden's trust. However, Mr. Bolden contacted the petitioner's trial counsel some days after the initial interview and advised him that he was not going to talk further with him about the crime. Consequently, although his strategy ultimately failed, trial counsel's decision to attend Mr. Bolden's interview without a witness or recording device does not appear to us to have been deficient at the time it was made.

C.

Finally, the petitioner claims ineffective assistance of counsel because his trial counsel failed to withdraw after the petitioner wrote a letter to the Board of Professional Responsibility (the "Board") and several letters to the trial court complaining about his counsel's representation prior to trial. However, we have previously indicated that trial counsel is not required to withdraw representation merely because a client has filed a complaint against him with the Board. *See Quentin Lewis v. State*, No. W1998-00793-CCA-R3-PC, 2001 Tenn. Crim. App. LEXIS 52, \*\*11-12 (Tenn. Crim. App. Jan. 23, 2001) (holding trial counsel's performance was not rendered constitutionally deficient by virtue of her failing to request to withdraw after appellant filed a complaint against her with the Board)*; Cf. State v. Richard Higgs*, No. W2000-02588-CCA-MR3-CD, 2002 Tenn. Crim. App. LEXIS 667 at \*\*6-10 (Tenn. Crim. App. Aug. 5, 2002) (although three complaints had allegedly been filed with the Board concerning trial counsel by the defendant at the time of trial, the defendant had "not provided this Court with sufficient information to determine that there existed a conflict of interest requiring defense counsel's withdrawal"). Any rule that would essentially permit a defendant to automatically discharge his appointed counsel simply by raising written complaints would inevitably become the subject of delaying tactics and abuse. *Cf. State v. Willis*, 301 S.W.3d 644, 652 (Tenn. Crim. App. 2009) (wherein "[t]he defendant used the tactic of . . . filing complaints against [his lawyers] with the Board of Professional Responsibility as a means of coercing the court into discharging counsel and . . . the pattern was for the tactic to be employed as trial dates approached"). With respect to the subject matter of the defendant's complaint, we view the defendant's act of filing a complaint with the Board as merely raising an allegation of wrongdoing against his attorney. To succeed on an ineffective assistance of counsel claim, however, the defendant must show clear and convincing evidence of actual conduct that

would require counsel to withdraw and the resulting prejudice. The petitioner has failed to do so.

## II.

The petitioner next complains that the State withheld exculpatory evidence when it failed to produce the medical records pertaining to Ms. Lorraine Young held at Lakeshore Mental Health Institute in response to trial counsel's generalized requests for the medical records of the State's witnesses. It is well established that "[s]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83 (1963). However, in this case, the petitioner's claim fails because the prosecution did not actually suppress Ms. Young's medical records and the records at issue would not have been material to the defense.

The petitioner argues that the State suppressed the evidence because the evidence was contained in a state facility and the State failed to locate and disclose those records. To rule in the petitioner's favor on these facts would be tantamount to ruling that the State must search every state facility for potential records pertaining to every prosecution witness in every case. We have little difficulty determining that *Brady* and its progeny do not impose such a requirement on the State. *Brady* generally does not require the State to affirmatively seek out exculpatory evidence. *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). While we have hinted in the past that some leeway may exist in this general rule where the records sought are already "possessed by or under the control . . . of [a] government agency," *see id.*, this caveat is meant to refer to a prosecutor's affirmative "duty to learn of any favorable evidence known to the others acting on the government's behalf *in the case*, including the police." *Kyles v. Whitley*, 514 U.S. 419, 508 (1995) (emphasis supplied). If the prosecution is ever, in fact, under an affirmative duty to seek out potentially exculpatory files from a government agency that is entirely unrelated to law enforcement or the prosecution of the defendant's case, it is certainly not under circumstances such as these.

The record reflects that the prosecution had nothing in its files to indicate that Ms. Young suffered from mental health issues, and nothing indicates that the prosecution was aware that Ms. Young had ever sought mental health treatment or that mental health records might exist at any particular state facility. Absent being specifically requested to examine or produce records from Lakeshore Mental Health Institute (see *State v. Jeffrey R. Allen and Jennings Michael Coen,* No. 03C01-9708-CC-00367, 1999 Tenn. Crim. App. LEXIS 17 at **10-11 (Tenn. Crim. App. Jan. 8, 1999)) or, at the very least, being placed on some sort of notice that exculpatory records existed there, the prosecution had no affirmative duty to seek out such records and is not responsible for the consequences of any failure to locate them.

To rule otherwise would be to impose on the prosecution a duty to investigate its own witnesses that is simply breathtaking in its scope and arduousness. In order to secure any conviction, the prosecution would have to request any and all documents pertaining to every prosecution witness from every state agency and review all of those records for potential exculpatory material – or run the risk of having the conviction overturned if any such records should be discovered at a later time. Such a broad duty to search would be entirely inconsistent with our previous determination that the State bears no greater duty to search for exculpatory evidence than a defendant; "[w]hen exculpatory evidence is equally available to the prosecution and the accused, the accused 'must bear the responsibility of [his] failure to seek its discovery.'" *Marshall*, 845 S.W.2d at 233 (*quoting United States v. McKenzie*, 768 F.2d 602, 608 (5th Cir. 1985)).

Moreover, the records at issue were not material within the meaning of *Brady*. "Evidence is material when there is a reasonable probability that the result of the proceeding would have been different had the exculpatory evidence been disclosed." *Sample v. State*, 82 S.W.3d 267, 270-71 (Tenn. 2002). In making this determination, "a reviewing court must determine whether the defendant has shown that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict.'" *Johnson v. State*, 38 S.W.3d 52, 58 (Tenn. 2001) (*quoting Irick v. State*, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998)).

After thorough review, we conclude that the newly discovered medical records do not place the petitioner's case in a substantially different light. Many of the medical records at issue postdate the trial or concern medical problems that would not have affected Ms. Young's credibility as a witness. While some portion of the records chronicle Ms. Young's struggle with alcohol use, when she was on the stand, Ms. Young freely admitted to partaking of alcohol the evening before she witnessed the crime. The petitioner's trial counsel extensively cross-examined Ms. Young concerning the extent of her intoxication and impeached her using prior inconsistent statements that she made to the police. Medical records reflecting at most the witness' prior tendency towards alcohol use would not have rendered this cross-examination appreciably more effective. While the records also contain some reference to Ms. Young experiencing occasional auditory hallucinations, the likelihood that a jury would believe that Ms. Young happened to hallucinate an argument and a crime that were substantially identical in their details as those attested to by other witnesses is remote in the extreme. Finally, we observe that even if the medical records had contained material that could have been used to significantly strengthen the petitioner's challenge to Ms. Young's credibility, the testimony of three other eyewitnesses to the crime would still remain. The discovery of these new medical records simply does not undermine our confidence in the jury's verdict.

III.

The petitioner claims that Ms. Young's mental health records "constitute new scientific evidence which, in protecting Mr. Hodge's due process rights, warrants the grant of post-conviction relief and a new trial." However, we will not review this claim in a petition for post-conviction relief.

A claim of actual innocence based on new scientific evidence may be presented in a post-conviction proceeding. *Dellinger v. State*, 279 S.W.3d 282, 291 (Tenn. 2009); *cf.* T.C.A. § 40-30-102(b) (2011) (stating that a belated post-conviction claim may be filed "based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which he was convicted"). However, any other claims of actual innocence based on newly discovered evidence should be raised in a petition for a writ of error coram nobis. *Harris v. State*, 102 S.W.3d 587, 591 (Tenn. 2003); *Sarrah Hewlett v. State*, No. M2009-00379-CCA-R3-PC, 2010 Tenn. Crim. App. LEXIS 594, at \*\*13-14 (Tenn. Crim. App. July 20, 2010). In order to prevail on a claim of newly discovered evidence, the petitioner must show, *inter alia*, that the evidence would likely have changed the result of the trial. *E.g., State v. Singleton*, 853 S.W.2d 490, 496 (Tenn. 1993).

Although we freely acknowledge that psychiatry is indeed a science, we do not believe that newly discovered witness medical records, even those pertaining to psychiatric health, constitute "scientific evidence" within the meaning of *Dellinger*. Records are not "scientific" *per se*; we do not usually refer to record keepers or librarians as "scientists" or speak of the science of bookkeeping or accounting. Records may and often do contain information reflecting that some particular scientific research, test, analysis, or discovery has occurred, but this fact, standing alone, does not render such records "scientific" in and of themselves. Rather, any such records are, at most, evidence pertaining to any underlying science contained therein.

Consequently, while the records at issue here have only recently been discovered, there has not been any actual discovery of new scientific evidence. The scientific, psychiatric evidence reflected in those records – as it relates to the credibility of the prosecution's witness – is nearly a decade old. We have little difficulty concluding that such evidence is not new, and any attack based on it should have been brought pursuant to a writ of error coram norbis. In any event, for the reasons we discussed when rejecting the petitioner's *Brady* claim, the inclusion of this evidence would not have likely changed the result at trial.

IV.

Having found no error with respect to any of the individual claims brought by the

-10-

petitioner, we need not address the petitioner's argument that he is entitled to relief under the doctrine of cumulative errors, which recognizes that relief may be appropriate when "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process alone . . . cumulatively produce a trial setting that is fundamentally unfair." *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983).

CONCLUSION

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE